# EXHIBIT A

## AGREEMENT OF SALE

THIS AGREEMENT OF SALE ("**Agreement**") is made this 12th day of November 2024 ("**Execution Date**"), by and between: PORTERFIELD-SCHEID MANAGEMENT COMPANY LLC, a Pennsylvania limited liability company ("**Seller**"); and KEVIN M. BEAN LIVING TRUST, a living trust established under the laws of the Commonwealth of Pennsylvania ("**Buyer**").

## RECITALS

A.  Seller is the owner of the Premises (as defined herein).

B.  Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Premises, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises herein contained and intending to be legally bound hereby, the parties hereto declare, promise and agree as follows:

## ARTICLE I
## SALE OF PREMISES

1.1 Sale of Premises. Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement:

    a. all that certain parcel of real estate and all buildings and improvements situate thereupon, located in the North Cornwall Township, Lebanon County, Commonwealth of Pennsylvania, known and numbered as 890 Isabel Drive, having Parcel Id. No. 26-2339025-360204-0000 (the "**Real Property**").

    b. all of Seller's right, title and interest in any permits, approvals, licenses, right-of-ways, easements and other appurtenances pertaining to the Real Property, or any of them; and

    c. all of Seller's right, title and interest in and to all machinery, apparatus, personalty, appliances, equipment, fittings and fixtures now or hereafter attached, appurtenant to or forming a part of the Real Property, or any part thereof, including without limitation, crematory, sound system, refrigeration unit, HVAC, exhaust, pneumatic, mechanical, electrical, fire alarm, and other systems. All of Sections 1.1(a) through (d) shall hereafter be collectively referred to as the "**Premises**."

1.2 Purchase Price; Payment. The purchase price for the Premises shall be the sum of One Million Six Hundred Seventy-Five Thousand and NO/100 Dollars ($1,675,000.00) (the "Purchase Price"). At Closing (as defined herein), Buyer will deliver the full Purchase Price to the Seller.

1

1.3     Permits and Other Documentation. In addition to the conveyance of title to the Premises as described above, and to the extent assignable, Seller will assign, transfer and convey to Buyer, at no additional cost to Buyer, all rights, permits, work, easements, applications, studies and benefits in Seller's possession for development of the Premises already obtained or owned by Seller, including but not limited to the following:

    a.     all highway occupancy permits and signed plans from the Commonwealth of Pennsylvania and any other government entity and related studies;

    b.     all sewer capacity or permits issued by any municipality or municipal authority;

    c.     all current and prior land development plans and documents, application forms, written correspondence to and from agencies and contracted parties, and entitlements achieved;

    d.     all work-product of consultants and contractors related to the construction, repair or development of the Premises;

    e.     all work conducted or completed with federal, state, county, municipal and/or local agencies related in any way to stormwater or sediment and erosion control temporary or permanent measures and rights provided going forward;

    f.     all work conducted or completed with federal, state, county, municipal, and/or local agencies related to all public and private utility agreements or rights to connect;

    g.     all title reports, ALTA, topographic surveys, legal descriptions and surveys of the Premises;

    h.     true and correct copies of all easements, plans and rights-of-way relating to any utilities serving the Premises, on the Premises or affected by the Seller's development thereof;

    i.     all third-party warranties pertaining to and/or related to the Premises;

    j.     all engineering or other technical plans, studies or reports regarding, supporting or related to any of the items in this Section; and

    k.     If requested by Buyer, Seller will authorize any third party that performed work related to any of the items in this Section to release to Buyer said work, studies and/or reports without the obligation of further payment by Seller.

## ARTICLE II
## DEED; POSSESSION; TITLE

2.1 <u>Deed and Possession</u>. Seller will deliver a special warranty deed (the "**Deed**") for the Premises at Closing. Seller will deliver actual sole, exclusive physical possession of the Premises at Closing.

2.2 <u>Title</u>. The title to the Premises on the Closing Date (as defined herein) shall be such as will be insured by any reputable title insurance company as a good, complete and marketable title at regular rates free and clear of all liens and encumbrances except as follows:

    a.    accepted Defects (as defined herein);

    b.    facts shown on an accurate survey;

    c.    zoning and building regulations, ordinances and requirements as adopted by any authority having jurisdiction over the Premises;

    d.    easements of all roads, streets, lanes and avenues, if any, bounding or included within the boundaries of the Premises;

    e.    rights, if any, of any gas, telephone, electric, oil, or other public utility; and

    f.    real estate taxes, water and/or sewer rents for the current year which are not yet due.

Provided, however, that none of the foregoing exceptions shall render title to the Premises uninsurable at regular rates or would unreasonably interfere with Buyer's intended use and enjoyment of the Premises, which determination shall be made by Buyer in its sole and unfettered discretion.

2.3 <u>Title Commitment</u>. After the complete execution of this Agreement, Buyer will promptly order, at Buyer's sole expense, a title report concerning the Premises. Buyer will promptly provide Seller with a copy of the title report after Buyer receives the same. On or before the expiration date of the Due Diligence Period (as defined herein), Buyer shall notify Seller in writing of any objections to any encumbrances or other title matters concerning title to the Premises ("**Defects**"). In the event that Buyer so objects to any Defects within the Due Diligence Period, then Seller, at Seller's expense, shall have the option of curing any Defects so as to enable Seller to give title as required hereunder at the time of Closing. Seller shall notify Buyer of Seller's election whether or not to cure the Defects within ten (10) days of the Buyer's written notice of such Defects. If Seller elects not to cure all of the Defects, or if Seller fails to provide Buyer with any notice, Buyer will have the option to terminate this Agreement by providing Seller with written notice of such termination within the five (5) day period after the due date of Seller's notice to Buyer. In the event Buyer does not elect to terminate the Agreement under this Section within the time prescribed herein, Buyer shall be deemed to accept the title to the Premises with the Defects and/or encumbrances identified in the Buyer's title report, <u>*except that*</u> Buyer shall not be deemed

3

Case 1:24-bk-01127-HWV   Doc 85-1   Filed 11/12/24   Entered 11/12/24 14:09:51   Desc
Exhibit A- Agreement of Sale   Page 3 of 15

to accept any monetary liens and encumbrances concerning the Premises, which Seller hereby agrees will be satisfied in full at Closing. If Buyer elects to terminate this Agreement, the Deposit will be returned to Buyer, and neither party will have any further obligation to the other hereunder. Nothing herein shall relieve either party of responsibilities accruing prior to termination of this Agreement.

## ARTICLE III
## FINANCING CONTINGENCY

3.1     Financing Contingency. Buyer shall have from the Execution Date until 5:00 PM on the date that is the thirtieth (30th) day after the Execution Date (the "**Financing Contingency End Date**") to obtain a commitment from a lender of Buyer's choosing to finance such portion of the Purchase Price as Buyer shall determine upon such terms and conditions as Buyer shall determine in Buyer's sole and unfettered discretion. Such financing shall be available in an amount no less than $1,340,000 at an interest rate of no more than 8.5% per annum as amortized over a 15 year period. However, it is acceptable to the Buyer that the financing obtained be for a term of 5 years or more. (By way of explanation, if the loan was a 5 year loan at 8.5% amortized over a 15 year period that would be acceptable to the Buyer and would meet the Buyer's financing contingency.)

If the Buyer is unable to obtain the described financing commitment, Buyer shall have the option of terminating this Agreement by written notice provided to Seller. Upon Buyer's election to terminate this Agreement under this Section, this Agreement shall become null and void and neither party shall have any further obligations hereunder. If Buyer shall have failed to terminate the Agreement under this Section on or before the Financing Contingency End Date, this Section shall be deemed satisfied, and Buyer shall not have the option of terminating this Agreement under this Section thereafter.

## ARTICLE IV
## GENERAL REPRESENTATIONS AND WARRANTIES

4.1     Representations and Warranties of Seller. Seller, to induce Buyer to enter into this Agreement and to complete Closing, makes the following representations and warranties, all of which shall survive Closing; the representations and warranties made herein are true and correct as of the date of this Agreement, and shall be true and correct at and as of the Closing Date in all material respects as though such representations and warranties were made both at and as of the date of this Agreement and at and as of the Closing Date:

a.     Seller is the sole legal and equitable owner of all of the Premises and has the unrestricted right, power and authority to sell the same free and clear of all liens and encumbrances to Buyer upon the terms and conditions of this Agreement, subject, however to the approval of the United States Bankruptcy Court for the Middle District of Pennsylvania, as the Seller is the Debtor in a Chapter 11 (Subchapter V) bankruptcy proceeding in said court, docketed to No. 1:24-bk-01127-HWV therein. Seller is not a party to any option, right of first refusal, or any other agreement affecting Seller's rights to complete this sale, and Seller further represents and warrants that there

4

are no other grants or claims of right, title or interest in any portion of the Premises which will be in existence as of the Closing Date.

      b.      Subject to the restriction of Bankruptcy Court approval reference in the prior section, Seller has the full legal right, power and authority to enter into and perform Seller's obligations under this Agreement and under any other agreement, instrument or document required to be delivered by Seller prior to or at Closing (collectively, "**Seller Transaction Documents**"). This Agreement has been duly and validly executed and delivered by a person who has been duly authorized on behalf of Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms. When executed and delivered as contemplated herein, each of the Seller Transaction Documents shall constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with their terms, except as such enforceability may be limited by applicable law, including the orders of the Bankruptcy Court referenced herein.

      c.      The execution and delivery of the Seller Transaction Documents and compliance with their terms will not conflict with or result in the breach of any law, judgment, order, writ, injunction, decree, rule or regulation, or conflict with or result in the breach of any other agreement, document or instrument to which Seller is a party or by which Seller or the Premises is bound or affected, including but not limited to the approval of the United States Bankruptcy Court for the Middle District of Pennsylvania as referenced above.

      d.      To the best of Seller's knowledge, Seller has complied with all applicable federal, state and local environmental regulations regarding the Premises and there are no suits, actions or proceedings pending or to the best of Seller's knowledge, threatened against Seller with the exception of the bankruptcy proceeding referenced above.

      e.      During Seller's ownership of the Premises: (i) there have not been issued directly against Seller any notices of any zoning violations regarding the Premises, nor, to Seller's knowledge, has any tenant of Seller on the Premises received any notices of zoning violations; and (ii) Seller has not received notice of any outstanding violation of any other governmental law, rule, statute, ordinance, or regulation affecting the Premises.

      f.      Seller is not a "foreign person" as defined under Section 1445 of the Internal Revenue Code of 1986, as amended, and Buyer, therefore, is not required to withhold income tax from Seller under the federal law known as "FIRPTA."

      g.      Seller has not sold or subdivided any portion of the Premises during Seller's ownership of the Premises.

      h.      With the exception of the bankruptcy proceeding referenced herein, there are no claims, actions, suits or proceedings pending or, to the best of Seller's knowledge, threatened against or affecting Seller or the Premises, at law or in equity, before or by any federal, state, municipal or other governmental agency or instrumentality, domestic or foreign, or before any arbitrator of any kind wherever located, including, without limitation, assertions by a third party of the adverse possession of all or any part of the Premises, which would inhibit or prevent Seller

5

from fulfilling Seller's obligations hereunder; and Seller is not in default under any law or regulation or with respect to any judgment, order, writ, injunction, decree, award, rule or regulation of any court, arbitrator or federal, state, municipal or other governmental agency or any instrumentality.

    i.    There are no public improvements, mandated repairs or similar requirements, on or off the Premises, which have been ordered to be made by any governmental body, and, to Seller's knowledge, there are no special or general assessments pending against the Premises.

    j.    To the best of Seller's knowledge, all roads necessary for the full utilization of the Premises for its intended purposes have either been completed or the necessary rights of way therefor have either been acquired by the appropriate local authority, have been dedicated to the public use and accepted by said local authority or have been made available through adjoining private land, doing so in accordance with valid and enforceable public or private easements which will inure to Buyer's benefit on the date of closing.

    k.    Seller has not received any notice or request from any insurance company or board of fire underwriters requesting the performance of any work or alteration with respect to the Premises.

    l.    There are no existing service, equipment, supply or maintenance agreements entered into by Seller with respect to or affecting the Premises (collectively, "**Service Agreements**") that will be terminated on or before the Closing Date. Seller will be solely responsible for any responsibilities, penalties or liabilities arising from the termination of any Service Agreements that occur prior to Closing (as defined herein).

4.2    Representations and Warranties of Buyer. Buyer makes the following representations and warranties, all of which shall survive Closing; the representations and warranties made herein are true and correct as of the date of this Agreement, and shall be true and correct at and as of the Closing Date in all respects as though such representations and warranties were made both at and as of the date of this Agreement and at and as of the Closing Date:

    a.    Buyer is not currently involved in any litigation, receivership or bankruptcy proceedings which would inhibit or prevent it from fulfilling its obligations hereunder.

    b.    Neither the execution of this Agreement, nor the consummation of the transactions provided for herein at Closing will violate any agreement to which Buyer is a party or by which any of its property or other assets are bound or subject, or any law, order or decree.

    c.    Buyer has full legal right, power and authority to enter into and perform its obligations under this Agreement and under any other agreement, instrument or document required to be delivered by it prior to or at Closing (collectively, "**Buyer Transaction Documents**"). When executed and delivered as contemplated herein, each of the Buyer Transaction Documents will constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms; except as such enforceability may be limited by bankruptcy, insolvency,

6

Case 1:24-bk-01127-HWV    Doc 85-1    Filed 11/12/24    Entered 11/12/24 14:09:51    Desc
Exhibit A-Agreement of Sale    Page 6 of 15

reorganization, moratorium or other similar laws affecting creditors' rights generally and by the availability of equitable remedies.

    d.    The execution and delivery of the Buyer Transaction Documents and compliance with their terms will not conflict with or result in the breach of any law, judgment, order, writ, injunction, decree, rule or regulation, or conflict with or result in the breach of any other agreement, document or instrument to which Buyer is a party.

## ARTICLE V
## ENVIRONMENTAL MATTERS

5.1    Environmental Matters. Seller represents and warrants to Buyer, which representations and warranties shall survive Closing, that, to the best of Seller's knowledge, and since the date Seller acquired the Premises:

    a.    The Premises and all activities and conditions at the Premises are in compliance with the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§9601 *et seq.*, as amended from time to time ("**CERCLA**"), the Resource Conservation and Recovery Act, 42 U.S.C. §§6901 *et seq.*, as amended from time to time, the Clean Water Act, 33 U.S.C. §§1251 *et seq.*, as amended from time to time ("**Clean Water Act**"), the Clean Air Act, 42 U.S.C. §§7401 *et seq.*, as amended from time to time, the Toxic Substances Control Act, 15 U.S.C. §§2601 *et seq.*, as amended from time to time, the Pennsylvania Hazardous Site Cleanup Act, 35 P.S. §§6020.10 *et. Seq.*, as amended from time to time, the Dam Safety and Encroachments Act, 32 P.S. §§693.1 *et. Seq.*, as amended from time to time and with all other federal, state and local environmental statutes, ordinances, regulations, orders and requirements of common law, including without limitation, those relating to: the discharge, emission or release of any Contaminant (hereinafter defined) to the air, soil, surface water or ground water; the discharge of any dredge or fill material to a wetland or other water of the United States; the storage, treatment, disposal or handling of any Contaminant; or the construction, operation, maintenance or repair of aboveground or underground storage tanks (collectively, "**Environmental Laws**").

    b.    No Contaminant that may require remediation under any Environmental Law is present on, over or under or is migrating on, to or from the Premises or on, over or under any premises adjacent to the Premises. The term "**Contaminant**" shall mean any material that is or contains any "hazardous substance," "hazardous waste," "hazardous material," "regulated substance," "petroleum," "pollutant or contaminant" as defined pursuant to any Environmental Laws or any polychlorinated biphenyls ("**PCBs**") or substances containing PCBs, any urea formaldehyde foam, or any asbestos or materials containing asbestos.

    c.    Seller has not discharged any dredge or fill material to any "wetland" or "waters of the United States" or "waters of the State of Pennsylvania" on either Premises, as those terms are defined in the rules and regulations promulgated pursuant to the Clean Water Act or other applicable federal, state or local law.

7

d. The Premises is not listed or proposed for listing on the National Priorities List established pursuant to Section 105(8)(B) of CERCLA, 42 U.S.C. §9605(8)(B), or on any other hazardous site list promulgated by any federal, state or local government or governmental agency.

e. There are no liquid storage tanks on or under the Premises of any kind, including, without limitation, underground storage tanks as defined by Section 6021.103 of the Storage Tank and Spill Prevention Act, 35 Pa.C.S. § 6021.101 *et seq.*

f. No civil, criminal or administrative proceeding is pending or threatened relating to Environmental Laws or Contaminants on, over, under, from or affecting the Premises; Seller has not received any notice of violation or potential liability regarding the Premises or activities thereon relating to Environmental Law or Contaminants on, over, under, from or affecting the Premises and Seller does not have reason to believe such notices will be received or has reason to know of circumstances that would give rise to such notices or proceedings in the future; Seller has not entered into any consent order, consent decree, administrative order, judicial order or settlement relating to Environmental Laws or Contaminants on, over, under, migrating from or affecting the Premises.

## ARTICLE VI
## EMINENT DOMAIN; MUNICIPAL IMPROVEMENTS; CASUALTY DAMAGE

6.1 Eminent Domain. Seller represents that Seller has not heretofore received any notice of any condemnation proceeding or other proceedings in the nature of eminent domain in connection with the Premises. In the event of the taking or threatened taking of any part of the Premises by eminent domain proceedings or the commencement of such proceedings, Seller will provide Buyer with prompt notice of the same, and Buyer will have the option to declare this Agreement null and void within fifteen (15) days after receipt of Seller's notice. Upon such declaration, the Deposit will be returned to Buyer and no party will have any further obligations to the other parties hereunder. Notwithstanding the foregoing, Buyer may elect to proceed with the purchase, without abatement of the Purchase Price, and with an assignment of all Seller's right, title and interest in and to any condemnation award.

6.2 Assessments for Municipal Improvements. Certain municipal improvements such as sidewalks and sewers may result in the municipality charging property owners to pay for the improvements. Seller will give Buyer written notice of any such municipal improvements within five (5) days of learning of the same. Buyer will, within fifteen (15) days after receiving said notice, notify Seller whether Buyer wishes to terminate this Agreement. If Buyer does not elect to terminate this Agreement, Buyer will be responsible for the cost of such municipal improvements. If Buyer elects to terminate this Agreement, the Deposit will be returned to Buyer, this Agreement will be null and void and the parties hereto shall have no further obligation to each other hereunder.

6.3 Casualty Damage. If prior to Closing all or any portion of the Premises is damaged by fire or other casualty, then Seller shall promptly notify Buyer of the casualty event and either Buyer or Seller may elect thereafter to terminate this Agreement. Buyer or Seller will have a period of fifteen (15) days after Buyer's receipt of the required notice as set forth in this Agreement to notify the other whether Buyer or Seller wishes to terminate this Agreement. If Buyer or Seller elects to

8

terminate this Agreement, the Deposit will be returned to Buyer, this Agreement will be null and void and the parties hereto shall have no further obligation to each other hereunder. If neither Buyer, nor Seller, elects to terminate this Agreement, then, at Closing, Seller will assign to Buyer all insurance proceeds paid to or payable to Seller by reason of the fire or other casualty identified herein. Seller will further undertake any action and execute any and all assignments and other documents or instruments as may be reasonably requested or as may be necessary to obtain and transfer all of the Seller's interests in such insurance proceeds to Buyer. Notwithstanding anything contained or construed in this Agreement to the contrary, Buyer's indefeasible receipt of such insurance proceeds on or before Closing shall be a condition to Buyer's obligation to close on its purchase of the Premises. In the event such insurance proceeds are not received or receivable by Buyer within sixty (60) days after December 31, 2024, then Buyer shall have a continuing right to terminate this Agreement, in which case the Deposit shall be returned to Buyer and this Agreement shall become null and void except for obligations first arising prior to the termination of this Agreement.

6.4   Extension of Closing. In the event of the occurrence of any of the matters set forth in this Article, and provided there is less than fifteen (15) days from the date Buyer receives the required notice and the Closing Date, at Buyer's option, the Closing Date will be extended until not later than the sixteenth (16th) day after Buyer's receipt of the required notice by Seller.

## ARTICLE VII
## GENERAL COVENANTS

7.1   Seller Covenants. In addition to covenants set forth elsewhere herein:

a.   Notice Covenants. Prior to Closing, Seller shall promptly notify Buyer promptly of the occurrence of any of the following: (i) a fire or other casualty causing damage to the Premises, or any portion thereof; (ii) receipt of notice of eminent domain proceedings or condemnation of or affecting the Premises, or any portion thereof, or any municipal improvement affecting the Premises, or any portion thereof; (iii) receipt of notice from any governmental authority or insurance underwriter relating to the condition, use or occupancy of the Premises, or any portion thereof, or any real property adjacent to any of the Premises, or setting forth any requirements with respect thereto; (iv) receipt of any notice of default from the holder of any lien or security interest in or encumbering the Premises or any portion thereof; or (v) receipt of any notice of any actual litigation or threatened litigation of which Seller has knowledge, against Seller or affecting or relating to the Premises, or any portion thereof.

b.   Operations Prior to Closing. At all times prior to Closing, Seller will:

i.   maintain the Premises in good condition and repair, reasonable wear and tear excepted, and continue to operate the Premises in substantially the same manner as presently being operated until the Closing Date and remove and dispose of any items not related to the business operation and deliver the property in clean and uncluttered condition.

ii.   not make or permit to be made any alterations, improvements or additions to the Premises exceeding Five Thousand Dollars ($5,000) in value without the prior written

9

consent of Buyer, which consent shall not be unreasonably withheld, except those required by applicable law or ordinance. If said consent is not received within five (5) days of notice to Buyer, consent shall be implied and Seller may move forward as if consent was provided; and

    iii. not enter into any other agreements which affect the Premises, including, without limitation, any leases, easements, licenses, restrictions or other appurtenances, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. If a response is not received within five (5) days of notice to Buyer, consent shall be deemed to have been given by Buyer and Seller may move forward based upon such deemed consent; and, except as provided for hereinabove shall not permit the creation of any liability which shall bind Buyer or either Premises after Closing.

  c. Liens. In the event any claim is made by any party for the payment of any amount due for the furnishing of labor and/or materials to the Premises or the Seller prior to Closing, or in the event any lien is filed against the Premises subsequent to Closing as a result of the furnishing of such materials and/or labor prior to Closing, Seller shall immediately pay said claim and discharge said lien; provided, however, in the event Seller desires to challenge or contest any such claim, Seller must first bond over or place into escrow the amount necessary to pay such claim.

  d. Insurance. The Premises is insured and Seller shall keep the Premises insured under a currently effective policy of comprehensive liability insurance in commercially reasonable amounts which will be kept in full force and effect until the Closing.

## ARTICLE VIII
## BUYER'S CONDITIONS PRECEDENT TO CLOSING

8.1 Buyer's Conditions Precedent to Closing. In addition to express conditions precedent set forth elsewhere herein, the obligations of Buyer under this Agreement are subject to the satisfaction, on or before Closing, of each of the following conditions, each of which may be waived by Buyer, in Buyer's sole discretion:

  a. All of the representations and warranties by Seller set forth in this Agreement shall be true and correct at and as of the Closing Date in all respects as though such representations and warranties were made both at and as of the date of this Agreement and at and as of the Closing Date, and said representations and warranties shall not contain any untrue statement or omit material facts causing any statement to be misleading; and

  b. Seller shall have performed all covenants, agreements and conditions required by this Agreement to be performed by Seller prior to or as of the Closing Date.

## ARTICLE IX
## CLOSING

9.1 Time and Place of Closing. Provided that Buyer has not terminated this Agreement as provided herein, the closing of the purchase and sale of the Premises pursuant to this Agreement (the "**Closing**") shall take place no more than twenty (20) business days after the expiration of the

10

Financing Contingency End Date (the "**Closing Date**") at such place as may be mutually agreed to by the parties hereto. Notwithstanding the foregoing, the parties may elect to execute all closing documents in advance of the Closing Date. In such case, an escrow agent and/or the parties, as applicable, shall hold all signature pages in escrow until each party agrees that such signature pages and funds may be released and the transaction closed. Such agreement shall be in writing and may be made by email exchanges between the parties and the escrow agent.

9.2     Closing Costs; Adjustments. Seller will pay for the preparation of the Deed (as defined herein) and one half of the realty transfer tax. Seller is responsible to comply with, and pay for, use and occupancy inspections or similar pre-closing inspections or permits required by the municipality in which the Premises is located in connection with sales of commercial properties. Electrical service, water service, gas service or other metered utilities payable by Seller shall be read on or immediately prior to the Closing Date, where practicable, and shall be billed to and paid by Seller. Buyer will pay one half of the realty transfer tax and one hundred percent (100%) of any costs associated with any searches, surveys, inspections, recording of deeds and mortgages, title insurance premiums and other costs of closing arising from Buyer's title company. County, local and school taxes shall be prorated. Except as set forth in subsection (b) below, all other items shall be prorated or allocated in the customary manner for a real estate transaction in Lebanon County, Pennsylvania.

9.3     Seller Obligations at Closing. At, on or before Closing, Seller shall have satisfied all conditions contained herein and shall deliver the following:

    a.     the Deed, in recordable form;

    b.     executed seller's affidavit satisfactory to Buyer's title company;

    c.     all permits and documents set forth in Section 1.3, above, including, without limitation, any and all warranties and guarantees with respect to both Premises, and any work performed thereon, with an executed assignment thereof;

    d.     any and all documents reasonably required by Buyer's title company in order to insure title at regular rates;

    e.     written payoff statement(s) or other evidence satisfactory to Buyer's title company that all liens against the Premises shall be satisfied or removed as of Closing;

    f.     sole and exclusive possession of the Premises.

    g.     such other documents, including a signed HUD-1 closing statement, as are necessary and appropriate for the consummation of this transaction by Seller and/or requested by Buyer and/or Buyer's title company.

9.4     Buyer's Obligations at Closing. At Closing Buyer shall have satisfied all conditions contained herein and shall deliver to Seller:

11

    a.      payment of the balance of the Purchase Price;

    b.      such other documents, including a signed HUD-1 closing statement as are necessary and appropriate for the consummation of this transaction by Seller and/or requested by Seller.

## ARTICLE X
## DEFAULT; REMEDIES

10.1   Seller Default. If Seller violates or fails to fulfill or perform any of the terms or conditions of this Agreement applicable to Seller, Buyer will have the right to: (a) specifically enforce this Agreement, (b) terminate this Agreement, or (c) pursue any other remedies Buyer may have at law or in equity against Seller.

10.2   Buyer Default. If Buyer violates or fails to fulfill or perform any of the terms or conditions of this Agreement applicable to it, Seller's sole right and exclusive remedy against Buyer shall be 1) to seek a judgment for damages or 2) to consider this Agreement to be null and void and to place the Premises back on the market without any limitation arising from the provisions of the within agreement.

## ARTICLE XI
## MISCELLANEOUS

11.1   Risk of Loss. Seller will bear all risk of loss with regard to the Premises until the Closing Date.

11.2   Brokerage. Buyer has not engaged a broker or agent in connection with the sale and purchase of the Premises. Each party is solely responsible, and shall indemnify and hold the other harmless from and against any and all claims for commission or other fees asserted by a broker, agent or other third party to this Agreement against the party alleged to have engaged the services of such broker, agent or other third party.

11.3   Assignability. Except as set forth below, no assignment shall be permitted without the prior written consent of each party.

11.4   Notices. All notices or other communications permitted or required under this Agreement must be in writing and will be sufficiently given: (a) if and when hand delivered to the parties; (b) if sent to the address set forth below by documented overnight delivery service or registered or certified mail, postage prepaid, return receipt requested; or (c) if sent by email, receipt acknowledged, at the email addresses set forth below. Any such notice shall be deemed given on the date delivered, if by hand, on the third day after deposit of the notice in mail pursuant to subsection (b), above, or upon receipt of the acknowledgement that the email transmission was successful.

12

Any notice to Seller shall be provided as follows:

| | |
|---|---|
| If to Seller: | Porterfield-Scheid Management Company LLC<br>Attn: Melanie Scheid<br>890 Isabel Drive<br>Lebanon, PA 17042 |
| With copy to: | |
| If to Buyer: | Kevin M Bean Living Trust<br>170 Hain Mill Road<br>Wernersville, PA 19565 |
| With copy to: | George M. Lutz, Esquire<br>Hartman, Valeriano, Magovern & Lutz, P.C.<br>1025 Berkshire Blvd. Ste. 700<br>Wyomissing, PA 19610 |

11.5 **Headings, Captions, Sections, Exhibits/ Schedule and Expressive Font.** The captions and headings in this Agreement are for convenience of reference only and may not be referred to in the construction or interpretation of this Agreement. Expressive font, including bolded, underlined and italicized words are used generally for convenience of reference and may not be referred to in the construction or interpretation of this Agreement. Unless otherwise noted, any reference in this Agreement to an "Article," "Exhibit," "Schedule," "Section" or a "Paragraph" refers, respectively, to articles, exhibits, schedule, sections or paragraphs in this Agreement. The content and terms of all exhibits and schedule (including any exhibits or schedule that are not completed as of the execution of this Agreement, but are subsequently agreed upon by the parties, and any amended exhibits and schedule) are by this reference incorporated into this Agreement.

11.6 **Binding Provision.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.

11.7 **Force Majeure.** In the event of an Interruption (as defined herein) that materially affects the ability of a Party in their performance of this Agreement, such Interruption shall not be deemed to be a breach of this Agreement and, to the extent possible or practical, the duties of the Party affected shall be suspended for a reasonable amount of time as it relates to the Interruption. As used above, an "**Interruption**" means an uncontrollable, unplanned disaster or occurrence that materially affects the ability of a Party in their performance of this Agreement, such as: occurrences commonly termed an "Act of God" (fires, explosions, earthquakes, hurricane, natural disasters, flooding, storms or infestation), war (or hostilities likely to lead to war), invasion, acts of foreign enemies, embargo, hazardous situations, riots, nuclear leaks or explosions, acts or threats of terrorism and pandemics (such as COVID-19).

11.8 **Severability.** The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other provision may be invalid or unenforceable in whole or in part.

13

11.9　Number and Gender. Words used in this Agreement, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context indicates is appropriate.

11.10　No Waiver. Neither the failure nor any delay on the part of either party to this Agreement to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of any such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

11.11　Negotiated Agreement. This Agreement is the product of the negotiation between the parties and their respective counsel. The parties hereto agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendment, schedule or exhibit thereto.

11.12　Time of the Essence. Time is of the essence of this Agreement. In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period provided in this Agreement shall end on a Saturday, Sunday or holiday, then the final day shall extend to 5:00 p.m., EST, of the next full business day. For the purposes of this Section, the term "holiday" shall mean a day other than a Saturday or Sunday on which banks in the state in which the Premises is located are or may elect to be closed.

11.13　No Recordation. This Agreement may not be filed of record in any office or place of public record except if required to obtain permits or in connection with litigation. Notwithstanding the foregoing, if a party hereto files this Agreement in contravention of the foregoing prohibition, that party shall take such action as may be required within five (5) days to remove this Agreement from the public record.

11.14　Further Actions. Seller and Buyer each agree to execute any and all documents necessary to effectuate the purposes of this Agreement and to take such further actions as are reasonably necessary to effectuate the purposes of this Agreement.

11.15　Execution Clauses.

　　a.　　Counterparts. This Agreement and any amendment, restatement, or termination of any provision of this Agreement may be executed in any number of separate counterparts by the parties hereto, each of which, when so executed and delivered, shall be deemed to be an original, and all of which counterparts, taken together, shall constitute one and the same instrument. Any signature page from any such counterpart may be attached to any other counterpart to complete a fully executed counterpart of this Agreement.

14

b. _Electronic Delivery of Manual Signatures_. Signatures to this Agreement transmitted in a commonly accepted electronic format (e.g., Adobe Portable Document Format, also known as PDF) that reproduces an image of the actual, manually executed signature page shall be deemed delivery of a binding original and shall have the same legal effect, validity, and enforceability as a manually executed counterpart of the document.

c. _Electronic Signatures_. The parties agree that this Agreement and any other documents to be delivered in connection herewith may be electronically signed (whether digital or encrypted), and that: (i) any electronic signatures appearing on this Agreement or such other documents are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility; and (ii) the use of electronic means constitutes acceptance and intent to be bound by the terms and conditions of this Agreement pursuant to the Pennsylvania Electronic Transactions Act (73 P.S. §§ 2260.101 _et seq._), the Electronic Signatures in Global and National Commerce Act (E-SIGN Act), 15 U.S.C. § 7001 _et seq._) and other applicable laws governing electronic signatures in the Commonwealth of Pennsylvania.

d. In no event shall any party be obligated hereunder unless and until this Agreement has been fully executed and delivered by all parties hereto.

11.16 _Entire Agreement_. This Agreement states the entire understanding reached between the parties hereto with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and warranties between the parties, and may not be amended except by written instrument executed by the parties hereto.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Agreement as of the day and year first above written.

**SELLER**

PORTERFIELD-SCHEID
MANAGEMENT COMPANY LLC

By: _/s/ Melanie B. Scheid_
Melanie B. Scheid, Member

By: _/s/ James A. Porterfield_
James A. Porterfield, Member

**BUYER**

KEVIN M. BEAN LIVING TRUST

By: _/s/ Kevin M. Bean_
Kevin M. Bean, Authorized Signer

15